IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| WHEELER ZAMICHIELI, | : | NO. 12-182 |
| Defendant. | : | |

ORDER

AND NOW, this 10th day of July 2014, upon consideration of Defendant's Post Trial Motions (Doc. No. 147) and the Government's Response in opposition thereto (Doc. No. 153), it is hereby ORDERED that the Motion (Doc. No. 147) is DENIED.

## I. BACKGROUND

In April 2012, a grand jury sitting in this judicial district alleged that, from July 13 to August 16, 2011, Wheeler Zamichieli was a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). A jury convicted Zamichieli on February 22, 2013. Presently before the Court is Zamichieli's motion for "judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, or, in the alternative, [for] a new trial pursuant to Federal Rule of Criminal Procedure 33." (Def.'s Post-Trial Mot. 1, Doc. No. 147.) The facts relevant to this motion begin in February 2011, when two Philadelphia police officers recovered a gun from the car that Zamichieli was driving. That gun is not the gun at issue in this case, but the circumstances under which the officers recovered it are relevant to Zamichieli's motion.

On February 20, 2011, two Philadelphia police officers initiated a traffic stop of a red Chevrolet Impala driven by Zamichieli. United States v. Zamichieli, No. 11-cr-393, 2011 WL 6133352, at *1 (E.D. Pa. Dec. 9, 2011). According to the officers, Zamichieli "turned on the

interior dome light as the officers approached," illuminating a "revolver sitting in plain view on the front passenger seat of the car." Id.  The officers then placed Zamichieli under arrest, alleging, among other things, that Pennsylvania law prohibited Zamichieli from possessing the gun.  See Docket 1–2, Commonwealth v. Zanichieli, No. MC-51-CR-0007356-2011 (Mun. Ct. Phila. Cnty. Apr. 27, 2011) ["Zanichieli I"], available at http://ujsportal.pacourts.us/DocketSheets/CPReport.ashx?docketNumber=MC-51-CR-0007356-2011.[1]  Zamichieli was released the next day after posting bail.  Id. at 2.

The United States Attorney's Office for the Eastern District of Pennsylvania adopted Zamichieli's case while he awaited trial on the Pennsylvania firearm charges.  On July 12, 2011, Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agent Patrick J. Henning filed a federal criminal complaint alleging that Zamichieli was a felon in possession of a firearm.  (See Crim. Complaint, Doc. No. 1, Case No. 11-cr-393.)  Magistrate Judge Linda K. Caracappa issued an arrest warrant for Zamichieli that same day.  (See Docket, Case No. 11-cr-393.)

Meanwhile, Zamichieli's Pennsylvania charges were scheduled for trial on July 13, 2011. See Docket 1, Commonwealth v. Zanichieli, No. CP-51-CR-0004828-2011 (Ct. Com. Pl. Phila. Cnty. July 13, 2011) ["Zanichieli II"], available at http://ujsportal.pacourts.us/DocketSheets/CPReport.ashx?docketNumber=CP-51-CR-0004828-2011.[2]  That day, Zamichieli drove the same red Impala partway to the courthouse, and then took public transportation the rest of the way.  (See Trial Tr. 164:17–25, 169:18–170:4, Feb. 20, 2013, Doc. No. 92.)  Special Agent

---

[1] The Pennsylvania courts refer to Zamichieli as "Troy Zanichieli."  Cf. Docket 1, Zanichieli I (listing Zamichieli's known aliases).

[2] Zamichieli's case was transferred from the Municipal Court of Philadelphia County to the Court of Common Pleas of Philadelphia County on April 27, 2011.  See Docket 3, Zanichieli II.

Henning executed the federal arrest warrant outside of the courthouse. (Id. at 156:13–20.) Later that day, Zamichieli asked Special Agent Henning to give the keys to the Impala to Santina Simmons, who was both the registered owner of the car and Zamichieli's girlfriend. (Id. at 169:8–17; Trial Tr. 7:14–24, Feb. 21, 2013, Doc. No. 93.) Special Agent Henning gave Simmons the keys on July 14, 2011. (Trial Tr. 170:5–8, Feb. 20, 2013.)

Zamichieli was detained in the Federal Detention Center in Philadelphia (the "FDC") pending resolution of his federal charge. (Cf. id. at 174:12–16.) Records of his telephone calls from the FDC – which Zamichieli knew were monitored, see Federal Detention Center Philadelphia, Pennsylvania, Admission & Orientation Inmate Handbook 14 (Jan. 15, 2009), available at http://www.bop.gov/locations/institutions/phl/PHL_aohandbook.pdf ("All inmate telephone calls will be monitored.") – comprise much of the evidence introduced against Zamichieli at trial. The investigation prompted by these recordings would eventually reveal that Zamichieli brought a gun with him partway to his trial for gun possession. The investigation would also reveal that Zamichieli directed Simmons to deliver that gun to a third party in exchange for $400.

The day after his federal arrest, Zamichieli called Simmons from the FDC. The following exchange took place:

> ZAMICHIELI: . . . Remember, remember that time when you had, when you had, uh, was riding with me that time and I went to the light switch?
>
> SIMMONS: Yeah.
>
> ZAMICHIELI: I need you to go to the light switch, ok?
>
> SIMMONS: Uh huh. Alright.

3

(Tr. of Call from Zamichieli to Simmons, July 14, 2011, 5:04 p.m., Gov't Ex. 8A.)  Simmons testified at trial that Zamichieli had previously shown her a hidden compartment in the red Impala behind the vehicle's light switch.  (See Trial Tr. 12:4–13:8, Feb. 21, 2013; see also Gov't Exs. 5B–D (depicting the compartment).)  Shortly after the telephone call with Zamichieli, Simmons "found a gun" in that compartment.  (Trial Tr. 23:23–25, Feb. 21, 2013.)  Later that night, Zamichieli called Simmons again.  He asked her whether she had "fix[ed] the light switch situation [he] told [her] about"; Simmons confirmed that she had.  (Tr. of Call from Zamichieli to Simmons, July 14, 2011, 9:25 p.m., Gov't Ex. 8B.)  Simmons later testified that she removed the gun from the Impala and placed it in her shed.  (See Trial Tr. 24:7–9, Feb. 21, 2013.)

Zamichieli and Simmons spoke again the next day.  Their conversation included the following discussion:

> ZAMICHIELI:  That dude, I don't know if you know this dude Hakiem on 17th Street.  He was going to give me four hundred for that light switch joint.  So maybe when you get a chance you can go down there and get that from him.
>
> SIMMONS:  What light switch, where is it?
>
> ZAMICHIELI:  Remember, remember what I was telling you yesterday, about the light switch?
>
> SIMMONS:  Oh ok.
>
> ZAMICHIELI:  You get that go down there ask for Hakiem.  Matter of fact, ask for Hak on 17th Street, and then, you know 'cause I had already informed him that I was going to let him get it anyway . . . .

(Tr. of Call from Zamichieli to Simmons, July 15, 2011, Gov't Ex. 8C.)

Hakeem Harris testified at trial that, in June 2011, he had seen a gun in the trunk of Zamichieli's car and asked Zamichieli whether the gun was for sale.  (Trial Tr. 90:18–92:8, Feb. 21, 2013.)  A few weeks later, according to Harris, Zamichieli brought the gun up again, saying that he "might sell that gun to [Harris]" for "3 to $400."  (Id. at 93:10–21.)  Harris understood

4

Zamichieli to mean that he would sell Harris the gun, but that the two had yet to agree on a sale price or date.  (Id. at 94:12–95:2.)

On July 18, 2011, Zamichieli called Harris from the FDC.  Zamichieli told Harris that he had called because "[his] chick" was "going to holler at [Harris]."  (Tr. of Call from Zamichieli to Harris, July 18, 2011, Gov't Ex. 8D.)  Zamichieli then asked Harris whether he "remember[ed] what [Zamichieli] was telling [him] about the last time."  (Id.)  After Harris said that he did remember, Zamichieli told Harris again that "[Zamichieli's] chick" was "going to be getting with [Harris]."  (Id.)

Zamichieli called Simmons two days later.  After Zamichieli told her that he had spoken with "[his] man Hak," Simmons told Zamichieli that the "only person [she] would talk to would be Jake because [she] [knew] Jake."  (Tr. of Call from Zamichieli to Simmons, July 20, 2011, Gov't Ex. 8E.)  Zamichieli told Simmons in response that she could "talk to Jake about Hak" and "explain the whole situation to him."  (Id.)  The next day, Zamichieli called Harris and told him that "[Zamichieli's] chick [was] going to . . . go through Jake with that because she [was] a little skeptical about doing it on her own."  (Tr. of Call from Zamichieli to Harris, July 21, 2011, Gov't Ex. 8F.)

On August 5, 2011, Zamichieli told Simmons over the telephone that he "did want [her] to go talk to Hakiem though for [him], so [he] could, uh, you know, put that towards paying Mike[3] some money."  (Tr. of Call from Zamichieli to Simmons, Aug. 5, 2011, Gov't Ex. 8G.)

On August 16, 2011, the following exchange took place between Zamichieli and Simmons over the telephone:

---

[3] According to Simmons, references to "Mike" refer to Zamichieli's lawyer, Michael Parlow.  (See Trial Tr. 45:12–16, Feb. 21, 2013.)

5

> ZAMICHIELI: You ain't get a chance to run across Jake yet?
>
> SIMMONS: I'm going to meet him tonight I think.
>
> ZAMICHIELI: Oh alright. Don't do no talking alright?
>
> SIMMONS: Huh?
>
> ZAMICHIELI: Don't do no talking, ok?
>
> SIMMONS: Yes.
>
> ZAMICHIELI: No talking.

(Tr. of Call from Zamichieli to Simmons, Aug. 16, 2011, Gov't Ex. 8K.)

Simmons and Harris both testified that Simmons delivered the gun to Harris on August 16, 2011, in exchange for $400. Simmons described the exchange as follows: "I met Jake and Hakeem at Jake's [print] shop. I was also picking up the shirts for my family reunion. While Jake was getting the shirts together for me, I had spoke[n] with Hakeem and gave him the gun, and he gave me the money." (Trial Tr. 49:21–25, Feb. 21, 2013.) Simmons later clarified that the gun was "inside of a hair dye box inside of a ShopRite bag." (Id. at 50:19–22.) Harris gave consistent testimony:

> Eventually, Jake did reach out to me, and we arranged to go to his -- his printing shop. So I followed Jake to his printing shop, and [Zamichieli's] girlfriend was already there.
>
> So we all went inside to his printing shop, talked for about ten minutes out in the main area. Then after that, we went into a smaller office, and we talked some more, about five more minutes. Then I handed [Zamichieli's] girlfriend the money, and she handed me a box in a yellow bag. . . .

(Id. at 97:1–10.) Harris testified that he found a gun inside the box. (Id. at 99:5–9.)

The day after Simmons and Harris met, Simmons sent Zamichieli an email in which she stated that she had "put $200 to the money for Mike" and that Zamichieli "should be receiving $200." (Email from Simmons to Zamichieli, Aug. 17, 2011, Gov't Ex. 7E.) A Western Union

6

receipt confirms that Harris sent Zamichieli $200 on Aug. 17, 2011.  (Customer Receipt, Aug. 17, 2011, Gov't Ex. 6.)

Zamichieli called Simmons on August 18, 2011.  He stated that he "was just reading [her] email" and asked her which friend of his had given her $200.  (Tr. of Call from Zamichieli to Simmons, Aug. 18, 2011, Gov't Ex. 8L.)  Simmons responded, "Hak."  (Id.)  Zamichieli subsequently asked Simmons "how much" "Hak" had given her; Simmons said "[f]our" in response.  (Id.)

In "mid to late August of 2011," Special Agent Henning obtained the recordings of Zamichieli's telephone calls.  (Trial Tr. 156:24–157:3, Feb. 20, 2013.)  These recordings caused Special Agent Henning to suspect that Zamichieli had hidden, and later directed Simmons to deliver, something in the Impala.  (Id. at 157:4–159:2.)  Special Agent Henning then interviewed Simmons on September 23, 2011, and Harris on November 17, 2011.  (Id. at 193:2–8, 194:7–10.)  During his interview, Harris gave Special Agent Henning the gun that Simmons had delivered to him on August 16, 2011.  (Id. at 194:20–22.)

A few months later, on December 9, 2011, Judge Schiller granted Zamichieli's motion to suppress the gun that the two Philadelphia police officers found in Zamichieli's car in February 2011.  See Zamichieli, 2011 WL 6133352, at *3.  Judge Schiller found the "officers' version of the story implausible" because "[t]here was no reason for Zamichieli to turn on the dome light," particularly with "a gun sitting in plain view on the front passenger seat."  Id. at *2.  "Without the dome light on," Judge Schiller reasoned, "it would be nearly impossible for [one of the police officers] to see a gun on the front seat through a closed, tinted window in the dark of night."  Id.  Judge Schiller "therefore credit[ed] Zamichieli's testimony that the gun was under the front passenger seat."  Id.  Judge Schiller concluded that the February 2011 search "was conducted in

7

violation of Zamichieli's Fourth Amendment rights," and that "all evidence obtained in connection with the search, including the gun and any statements made by Zamichieli following the search, must be suppressed as fruit of the poisonous tree." Id. at *3. Ten days later, Judge Schiller granted the government's motion to dismiss the federal charge against Zamichieli. (See Doc. No. 33, Case No. 11-cr-393.)

This case began on April 19, 2012, when a grand jury indicted Zamichieli on one count of being a felon in possession of a firearm. (Indictment 1, Doc. No. 1.) The grand jury alleged that, from July 13 to August 16, 2011, Zamichieli knowingly possessed the firearm that Special Agent Henning eventually recovered from Harris. (Id.)

A three-day jury trial began on February 20, 2013. The government called Simmons, Harris, and Special Agent Henning as witnesses. (See Trial Tr. 2:7–10, Feb. 20, 2013; Trial Tr. 2:2–9, Feb. 21, 2013.) The government also introduced, among other evidence, recordings and transcripts from Zamichieli's telephone calls with Simmons and Harris. (See Trial Tr. 3:3–5:11, Feb. 20, 2013.) Zamichieli, representing himself *pro se* with Michael K. Parlow, Esquire, acting as standby counsel, called no witnesses in his defense. (See Trial Tr. 153:7–8, Feb. 21, 2013.) The jury found Zamichieli guilty. (See Trial Tr. 51:3–53:20, Feb. 22, 2013, Doc. No. 94.)

Zamichieli now moves to set aside the jury's verdict. He alleges four errors. First, he argues that this Court should have suppressed the recordings of his telephone calls and the evidence derived therefrom. (See Def.'s Post-Trial Mot. 3–10.) Second, he claims that that the government's evidence was insufficient to support the jury's verdict. (See id. at 10–16.) Third, he alleges that this Court's jury instructions "had the overall, unintended effect of tipping the scales against him and towards the government." (Id. at 17; see id. at 17–25.) And fourth, he argues that "the taint of [his] unlawful arrest is darkened by the presence of disgraced

8

[Philadelphia] Homicide Detective Ronald Dove, author of the February 2011 [Philadelphia Police Department] Arrest Report on which the government's July 13, 2011 arrest warrant was based." (Id. at 25; see id. at 25–28.) For the reasons that follow, we find no error.

## II.  LEGAL STANDARD

Rule 29(a) of the Federal Rules of Criminal Procedure directs us, on the defendant's motion, to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." "The evidence is insufficient to sustain a conviction if a rational trier of fact could not have found proof of guilt beyond a reasonable doubt." United States v. Tyson, 653 F.3d 192, 199 (3d Cir. 2011). Under this standard, we "must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision." United States v. Pendleton, 636 F.3d 78, 83 (3d Cir. 2011) (internal quotation marks omitted); see also Tyson, 653 F.3d at 199. "Thus, an insufficiency of the evidence claim places a heavy burden on the [movant] because we will only find the evidence insufficient when the prosecution's failure is clear." United States v. Mercado, 610 F.3d 841, 845 (3d Cir. 2010).

Rule 33(a) authorizes us to "vacate any judgment and grant a new trial if the interest of justice so requires." Five requirements must be met before newly discovered evidence justifies a new trial:

> (a) the evidence must be in fact newly discovered, i.e. discovered since trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

United States v. Quiles, 618 F.3d 383, 388–89 (3d Cir. 2010) (internal quotation marks omitted). "A movant seeking a new trial on the basis of newly discovered evidence bears a heavy burden

in proving each of these requirements." United States v. Brown, 595 F.3d 498, 511 (3d Cir. 2010) (internal quotation marks omitted).

### III. ANALYSIS

A. Zamichieli's Rule 29 Motion

    1. The Court Properly Admitted the Telephone Conversations

Zamichieli argues that the recordings of his telephone conversations are inadmissible "fruits of an unconstitutional search." (Def.'s Post-Trial Mot. 4.) We must determine whether the recordings have "'been come at by exploitation of [an unconstitutional search] or instead by means sufficiently distinguishable to be purged of the primary taint.'" Brown v. Illinois, 422 U.S. 590, 599 (1975) (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)).

We find that the taint of the February 2011 search dissipated over the almost five months that elapsed between the search and telephone calls. Evidence acquired as a result of an unlawful search is inadmissible "up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" Murray v. United States, 487 U.S. 533, 537 (1988) (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)); see also Hudson v. Michigan, 547 U.S. 586, 592 (2006) ("[E]xclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence."). "To determine whether the taint of the initial illegality has been purged, the Supreme Court has instructed [lower courts] to focus on three non-dispositive factors: (1) the temporal proximity between the unlawful conduct and the recovery of the evidence; (2) 'the presence of intervening circumstances'; and (3) 'the purpose and flagrancy' of the unlawfulness." United States v. Dupree, 617 F.3d 724, 739 (3d Cir. 2010) (quoting Brown, 422 U.S. at 603–04). The government bears the burden of

10

proving attenuation by a preponderance of the evidence. See United States v. Pelullo, 173 F.3d 131, 135–38 (3d Cir. 1999).

Each of the three factors identified by the Third Circuit in Dupree suggests that the unconstitutional search did not taint the telephone calls. First, at least 144 days elapsed between the search and calls.[4] The Philadelphia police officers searched Zamichieli's car on February 20, 2011; Zamichieli made his first relevant phone call from the FDC on July 14, 2011. The months between these two events dissipated the taint of the illegal search. See United States v. Smith, 688 F.3d 730, 739 (11th Cir. 2012) ("[W]e have suggested that a period of four days supports the

---

[4] Zamichieli argues that his July 2011 arrest also tainted the telephone calls. He claims that this arrest was unconstitutional because (1) the "arrest warrant was issued in reliance on a deliberately or recklessly false, bare bones affidavit" and (2) the arresting "officers' narrative was so implausible that no United States agent could reasonably have believed it to be trustworthy." (Def.'s Post-Trial Mot. 7.) We disagree. Judge Schiller found the arresting officers' account of the traffic stop "implausible." Zamichieli, 2011 WL 6133352, at *2. But he did not find that the officers' account was "deliberately or recklessly false," or that their account was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." United States v. Pavulak, 700 F.3d 651, 664 (3d Cir. 2012) (internal quotation marks omitted). We find that Special Agent Henning held a sincere, "'objectively reasonable belief that the [arrest] warrant [was] based on a valid application of the law to all known facts.'" United States v. Zimmerman, 277 F.3d 426, 438 (3d Cir. 2002) (quoting United States v. Reilly, 76 F.3d 1271, 1273 (2d Cir. 1996)). Accordingly, Special Agent Henning did not violate the Constitution by arresting Zamichieli on July 13, 2011.

Moreover, the legality of the July 2011 arrest does not determine the outcome of Zamichieli's motion. Even assuming that this arrest did violate the Fourth Amendment, we would still find the telephone recordings admissible. Special Agent Henning arrested Zamichieli on the morning of July 13, 2011. Cf. Docket 1, Zanichieli II (indicating that Zamichieli's state-court trial was scheduled for "9:00 am" on "07/13/2011"). Zamichieli made his first relevant telephone call from the FDC more than 24 hours later. (See Tr. of Call from Zamichieli to Simmons, July 14, 2011, 5:04 p.m.) This relatively short time – at least compared with the more than 144 days that elapsed between the search and telephone calls – does not compel the conclusion that the recordings were tainted. See Rawlings v. Kentucky, 448 U.S. 98, 107–08 (1980) (concluding that a confession made "approximately 45 minutes" after an illegal arrest was admissible). Under the circumstances of this case, any taint from the July 2011 arrest dissipated before Zamichieli began to reveal his possession of a second gun by discussing that gun on a monitored telephone call.

11

conclusion that any taint from an illegal act is 'completely attenuated.'" (quoting Devier v. Zant, 3 F.3d 1445, 1459 (11th Cir. 1993) (per curiam)); United States v. Powell, 176 F. App'x 267, 269 (3d Cir. 2006) ("[The defendant's] subsequent confessions to authorities, occurring two days, five days, and three months after the search, after valid Miranda waivers, were sufficiently distanced in time and space so as to dissipate any taint.").

Second, significant developments separated the search and phone calls. The Pennsylvania court released Zamichieli the day after the Philadelphia police officers arrested him. Almost five months later, on July 13, 2011, Zamichieli returned to court for his gun-possession trial. Unbeknownst at the time to Special Agent Henning,[5] Zamichieli brought a gun with him partway to the courthouse. And then, beginning the next day, Zamichieli discussed his possession of this second gun during telephone conversations that he knew federal authorities were monitoring.[6] These unforeseeable circumstances severed any connection between the search and telephone calls.

And third, there is no reason to believe that the Philadelphia police officers violated Zamichieli's rights in February 2011 with the hope that Zamichieli would be released for almost five months, commit the same crime again, and then implicate himself in that second crime while in federal detention.

---

[5] Special Agent Henning testified that, even after listening to Zamichieli's telephone calls, he "was unable to figure out exactly what" Zamichieli had hidden in the red Impala. (Trial Tr. 159:3–7, Feb. 20, 2013.)

[6] Federal authorities did not perform a search within the meaning of the Fourth Amendment by monitoring Zamichieli's jail telephone calls. "[P]risoners do not have a reasonable expectation of privacy when speaking on a prison telephone, especially where a warning has been given." United States v. Shavers, 693 F.3d 363, 390 n.7 (3d Cir. 2012), rev'd on other grounds, 133 S. Ct. 2877 (2013).

We find that the government has carried its burden of proving attenuation. We therefore conclude that the Court properly admitted the recordings at trial. See Wong Sun v. United States, 371 U.S. 471, 491 (1963) ("On the evidence that [the defendant] had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement, we hold that the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint.'" (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)). This conclusion is consistent with the exclusionary rules "sole purpose": "to deter future Fourth Amendment violations." Davis v. United States, 131 S. Ct. 2419, 2426 (2011); see also id. at 2427 ("Real deterrent value is a 'necessary condition for exclusion,' but it is not 'a sufficient' one." (quoting Hudson v. Michigan, 547 U.S. 586, 596 (2006)). The connection between the search and telephone calls is so weak that suppressing the calls would not deter future unconstitutional searches.

Zamichieli was charged twice with the same crime: first in February 2011, and then again in July and August 2011. Law enforcement officers violated his rights once: in February 2011. This violation justified suppression of the gun found in February 2011. But it did not give Zamichieli immunity from future liability for illegal gun possession.

2. Substantial Evidence Supported the Jury's Verdict

The jury convicted Zamichieli of possessing a firearm in violation of 18 U.S.C. § 922(g)(1). "Section 922(g)(1) . . . requires proof that: (1) the defendant has been convicted of a crime of imprisonment for a term in excess of one year; (2) the defendant knowingly possessed the firearm; and (3) the firearm traveled in interstate commerce." United States v. Huet, 665 F.3d 588, 596 (3d Cir. 2012). Zamichieli argues that the government's evidence was insufficient to establish his possession of the gun. (See Defs.' Post-Trial Mot. 10–11.)

The government presented evidence that Zamichieli constructively possessed the gun while detained in the FDC. "Constructive possession occurs when a person who, although not in actual possession, knowingly has both the *power and the intention* at a given time to exercise dominion or control over a thing, either directly or through another person or persons." United States v. Benjamin, 711 F.3d 371, 376 (3d Cir. 2013) (internal quotation marks omitted). "Such dominion and control need not be exclusive but may be shared with others." Id. (internal quotation marks omitted). We must uphold the jury's verdict if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's conclusion that Zamichieli had both the power and intent to exercise control over the firearm. See United States v. Pendleton, 636 F.3d 78, 83 (3d Cir. 2011).

Here, ample evidence supported the jury's verdict. Zamichieli's telephone conversations and emails, Harris's testimony, and Simmons's testimony all establish the following chain of events: Prior to his July 2011 arrest, Zamichieli told Harris that he would sell him a gun for $300 or $400. After his arrest, Zamichieli told Simmons to remove a gun from the red Impala. Simmons removed the gun. A few days later, Zamichieli told Simmons to deliver that gun to Harris. Simmons did as Zamichieli instructed, using half of the $400 she received from Harris to reimburse herself for money she had spent on Zamichieli's legal expenses, and sending the other half to Zamichieli. This chain of events demonstrates that Zamichieli had the power and intent to control the gun through Simmons.

Zamichieli attempts to carry his heavy burden of establishing insufficiency by arguing that Simmons exercised control over the gun. (Def.'s Post-Trial Mot. 12–14, 16–17.) This argument does not undermine the jury's verdict because the "dominion and control [necessary

14

for constructive possession] need not be exclusive but may be shared with others." Benjamin, 711 F.3d at 376.

Zamichieli also argues that Simmons and Harris were unreliable and potentially biased witnesses. (Def.'s Post-Trial Mot. 14–17.) At most, Zamichieli establishes that a rational factfinder might have disbelieved Simmons's and Harris's testimony. But that is not Zamichieli's burden; he must show that "a rational trier of fact could not have found proof of guilt beyond a reasonable doubt." United States v. Tyson, 653 F.3d 192, 199 (3d Cir. 2011). Viewing the evidence in the light most favorable to the government, we conclude that substantial evidence supported the jury's verdict.

    3.   The Court Properly Instructed the Jury

Zamichieli claims that "remarks within the Court's jury instruction . . . had the overall, unintended effect of tipping the scales against [him] and towards the government." (Def.'s Post-Trial Mot. 17.) We disagree.

The Court "is permitted considerable latitude to summarize and comment upon the evidence, provided that the jury is neither confused nor misled." Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 79 (3d Cir. 2009). Moreover, "even if a judge's comments confuse or mislead the jury, any resulting error may be cured by instructing the jury that 'only its decision counts and that it does not have to be influenced by anything [the judge] thinks or says.'" United States v. Barnes, No. 05-cr-134, 2009 WL 2169212, at *4 (E.D. Pa. July 20, 2009) (alteration in original) (quoting Hughes v. Consol-Pennsylvania Coal Co., 945 F.2d 594, 617 (3d Cir. 1991)). The dispositive question is whether the Court's "charge, taken as a whole and viewed in light of the evidence, fairly and adequately submit[ted] the issues in the case to the jury." Limbach Co. v. Sheet Metal Workers Int'l Ass'n, AFL-CIO, 949 F.2d 1241, 1259 n.15 (3d Cir. 1991) (en

banc) (internal quotation marks omitted); see also United States v. Urban, 404 F.3d 754, 779 (3d Cir. 2005).

Zamichieli argues that three of the Court's instructions prejudiced him. First, he claims that the Court should not have told the jury that it was neither "'charged with deciding whether it's right or wrong that Hakiem [sic] Harris is presently on bail'" nor "'formally asked to decide whether Santina Simmons should have been charged with a crime.'" (Def.'s Post-Trial Mot. 19 (quoting Trial Tr. 10:15–19, Feb. 22, 2013).) He argues that this instruction "[told] the jury to disregard the actions and motives of Simmons and Harris." (Def.'s Post-Trial Mot. 20.) Similarly, Zamichieli seems to argue that it "'appear[ed] clear to the jury that the court believ[ed] the accused is guilty'" (id. (quoting United States v. Beaty, 722 F.2d 1090, 1093 (3d Cir. 1983)) when the Court stated that Simmons's and Harris's interactions with the criminal justice system were "'very intellectually interesting'" but "'not central to [the jury's] core task'" (Defs. Mots. 19 (quoting Trial Tr. 11:3–6, Feb. 22, 2013)). No reasonable jury would have interpreted the Court's comments as Zamichieli suggests, particularly after the Court instructed it to "look at [the witnesses'] potential motive[s] in testifying." (Trial Tr. 21:20–21, Feb. 22, 2013.) We conclude that these instructions were proper, because the only question before the jury was whether Zamichieli possessed the gun.

Second, Zamichieli contends that, by complimenting Zamichieli in front of the jury, the Court implied that Zamichieli had "made poor life choices." (Def.'s Post-Trial Mot. 21.) The Court's comments did not imply that it held a negative view of Zamichieli's choices. Rather, the Court clarified for the jury that it was not being asked to decide "Zamichieli's potential as a human being or his intellect," or "whether life has been fair to him in the past or whether it will be fair to him in the future." (Trial Tr. 11:14–19, Feb. 22, 2013.) The Court also told the jury

16

that, "*if* it is established that a person knowingly and intelligently violated [the law], then they bear the consequences of their choice." (Id. at 13:4–6 (emphasis added).) These comments were proper.

Third, Zamichieli asserts that this Court gave prejudicial examples of constructive possession. (Def.'s Post-Trial Mot. 23–25.) The Court explained to the jury that a person has constructive possession of something when he or she has the power, ability, and intent to exercise control over that thing. (See Trial Tr. 34:5–13, Feb. 22, 2013.) The Court then illustrated this concept by explaining that it maintained constructive possession over its files even if it left those files in its office, house, or car. (Id. at 34:14–35:3.) Zamichieli claims that, by giving examples of "indisputable possession," the Court created a "strong likelihood that the jury would misunderstand those concepts as applies to this case." (Def.'s Post-Trial Mot. 25 (emphasis omitted).) He also argues that the Court's reference to its car "referred exactly and suggestively" to the allegations against Zamichieli. (Id. at 24.) The Court did not err by giving clear, everyday examples of constructive possession.

We conclude that none of the Court's comments confused or misled the jury. And, even if one of its comments did confuse or mislead the jury, the Court cured that deficiency by explaining that the jury had "the full and complete authority to decide what the true facts are in this matter," and that "neither [the Court] nor the advocates can tell [the jury] what the true facts are." (Trial Tr. 14:2–10, Jan. 22, 2013; see also id. at 14:17–19.) The Court's instructions fairly submitted the issues to the jury.

B. Zamichieli's Rule 33 Motion

Zamichieli argues that he is entitled to a new trial because Philadelphia Homicide Detective Ronald Dove authored the February 2011 arrest report. (See Def.'s Mot. 25–28.) He

17

claims that recent developments unrelated to this case have called Detective Dove's credibility into question, and that Detective Dove's involvement in Zamichieli's first gun possession case taints this gun possession case. (See id.) At most, these recent developments suggest that the February 2011 search may have been improper. But the propriety of that search is neither in dispute – Judge Schiller already ruled that it was improper – nor relevant to this case. The February 2011 search did not taint the evidence introduced in this case. See Part III.A.1, supra.

## IV. CONCLUSION

For the foregoing reasons, we will deny Zamichieli's post-trial motion.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.